**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**THE CINCINNATI ENQUIRER,**

    **Plaintiff,**

    v.

**UNITED STATES DEPARTMENT
OF JUSTICE,**

    **Defendant.**

**Case No. 1:23-cv-682**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Defendant United States Department of Justice (DOJ) moves the Court for summary judgment on Plaintiff The Cincinnati Enquirer's (Enquirer) Freedom of Information Act (FOIA) request. The DOJ argues that it cannot respond to the Enquirer's request—which demands records containing text messages between former Cincinnati City Councilwoman Tamaya Dennard and seven private individuals—without facilitating an unwarranted invasion of those individuals' personal privacy interests. For the reasons that follow, the Court agrees and **GRANTS** Defendant's Motion for Summary Judgment (Doc. 19).

### BACKGROUND[1]

Backroom deals, shady money, and law enforcement stings. Though that might sound like fodder for a Hollywood period piece set in the '70s, *see American Hustle*

---

[1] In recounting a case's factual background at the summary judgment stage, the Court normally relies on the proposed undisputed facts that the parties submit in response to the Court's Standing Order I.F.2, available at https://perma.cc/S2YS-S7ZP. Here, though, only the DOJ's filings comply with that Standing Order. That is perhaps surprising, in that the

(Columbia Pictures 2013), it also happens to aptly describe some of the goings-on involving certain Cincinnati City Council members not so long ago. From 2020 to 2023, three City Council Members either pleaded guilty to, or were convicted of, offenses related to their allegedly soliciting bribes in exchange for political favors.[2] (Compl., Doc. 1, #2–5); *see also* Kevin Grasha et al., *"I Let Them Down Again": Tamaya Dennard Sentenced to 18 Months in Prison*, Cincinnati Enquirer (Nov. 24, 2020, 1:25 PM), https://perma.cc/5ZFE-SJ9C.

This case revolves around the FBI's investigation of one of those three city councilmembers: Tamaya Dennard (not a party here). (*See generally* Doc. 1). According to the Enquirer, federal authorities obtained Dennard's phone, which contained text messages discussing bribes with "developers and prominent businesspeople" in Cincinnati. (*Id.* at #3). Because those alleged texts reflect "matters of great public importance," (*id.* at #5), a reporter for the Enquirer attempted to obtain their contents through a FOIA request directed at the DOJ.[3] (Doc. 1-1, #11–

---

DOJ filed its Motion for Summary Judgment (Doc. 19) before this case was transferred to this Court—that is, before this Court's Standing Orders came to govern the proceedings. (*See* Doc. 21). The Enquirer, on the other hand, filed its response *after* the transfer—that is, when this Court's Standing Orders were clearly in force—and yet declined to follow the rule. That leaves the Court to piece together the background of this case as best it can, without a clear sense of which facts the Enquirer contends are disputed or why.

[2] It bears noting, however, that one of those convictions is on appeal. *United States v. Sittenfeld*, 669 F. Supp. 3d 672 (S.D. Ohio 2023), *appeal docketed*, No. 23-3840 (6th Cir. Oct. 17, 2023).

[3] The parties' filings aren't consistent in naming the entity to which the Enquirer directed its FOIA request. The Complaint says the Enquirer requested disclosure from the "United States Attorney's Office," (Doc. 1-1, #11), while the DOJ's proposed list of undisputed facts states that the request was submitted to the "Department of Justice" itself, (Doc. 19-2, #105). Both documents describe the request as initially processed by the "Executive Office for United States Attorneys." (Doc. 1, #6; Doc. 19-2, #106). In any case, the United States Attorney's Office and the Executive Office for United States Attorneys are both components of the DOJ.

12); *see also* 5 U.S.C. § 552(a)(3)(A) (requiring agencies to "make … records promptly available to any person" upon request). That request sought the following records:

    a. All text messages between Tamaya Dennard to and from Bob Castellini concerning a request by Dennard for any thing [sic] of value between Jan. 1, 2019[,] and July 31, 2019.

    b. All text messages between Tamaya Dennard to and from Dan Schimberg concerning a request by Dennard for any thing [sic] of value between Oct. 1, 2019[,] and March 2, 2020.

    c. All text messages between Tamaya Dennard to and from Peter Klekamp concerning a request by Dennard for any thing [sic] of value between Nov. 1, 2019[,] and today [sic] and March 2, 2020.

    d. All text messages to and from Jim McGraw concerning a request by Dennard for anything of value between Oct. 1 and March 2, 2020.

    e. All text messages to and from Dan Neyer concerning a request by Dennard for anything of value between Oct. 1 and March 2, 2020.

    f. All text messages between Shree Kulkarni concerning a request by Dennard for anything of value between Oct. 1 and March 2, 2020.

    g. All text messages between Chip Gerhardt concerning a request by Dennard for anything of value between Aug. 1 and March 2, 2020.

(Doc. 19-2, #105–06). In sum, the Enquirer sought all records of any text messages between Dennard and seven specifically named individuals.

The DOJ denied that request, indicating that it would not even conduct a search to determine if it had any such records. (*Id.* at #106 (relaying that DOJ "closed the request" because "any responsive records would be categorically exempt from disclosure")). In doing so, it relied on Exemptions 6 and 7(C) to the FOIA, which shield different (though sometimes overlapping) classes of records based on potential privacy concerns. (Doc. 1-2, #14–15 (citing 5 U.S.C. § 552(b)(6) and (7)(C))). The

---

*See* Department of Justice Organizational Chart, available at https://perma.cc/7WDR-NMAQ. So for the sake of consistency and simplicity, the Court will refer to those entities by the name of their parent entity (and Defendant here): DOJ.

Enquirer appealed that denial to the DOJ's Office of Information Policy, which affirmed the initial decision. (Docs. 1-3, 1-4).

Having exhausted the administrative process, the Enquirer sued in federal court, requesting injunctive relief in the form of an order to turn over any responsive documents, along with attorneys' fees under 5 U.S.C. § 552(4)(B) and (E). (Doc. 1, #8). The DOJ now moves for summary judgment. (Doc. 19). But it has changed its tune as to why. Instead of restating that it is refusing to search for the records, the agency argues that it can neither confirm nor deny the existence of responsive records, which is known as a "*Glomar* response." *See generally Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976). In putting forth its *Glomar* response, though, the DOJ essentially relies on the same grounds it asserted in its initial refusal to search: that merely acknowledging whether responsive records exist would constitute an unwarranted invasion of the named individuals' privacy.[4] (*See generally* Doc. 19). The Enquirer responded, (Doc. 22), and the DOJ replied, (Doc. 24). The matter is now ripe for the Court's review.

---

[4] Two things about this sequence bear noting. First, the DOJ contends, and the Enquirer does not dispute, that the DOJ's failure to assert a *Glomar* response in the initial proceedings before the agency does not waive the DOJ's right to assert it now. (Doc. 19, #97 n.1). Second, the FOIA imposes an obligation on agencies to search in good faith for responsive documents separate and apart from the obligation to produce such documents. *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012) (citing *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011)). Thus, the DOJ's initial tack of saying it was refusing to search, instead of a making a *Glomar* response, may have itself been a FOIA violation. But the Enquirer asserts no such FOIA claim in its Complaint, so the Court declines to address the issue. *See id.* ("[Plaintiff] did not dispute that the [agency] conducted a good-faith search for records … [so] the district court addressed only the applicability of the government's claimed exemptions.").

4

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that (1) there is no genuine dispute as to any material fact, and (2) they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The first part of the summary judgment standard focuses on the factual record: the movant bears the burden of pointing to specific evidence in the record to show the absence of a genuine dispute of material fact (or, if it is an issue on which the non-movant bears the burden at trial, the lack of any evidence that would allow the non-movant to meet that burden). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The second part of the standard requires the movant to show that the facts (or lack of facts) identified at the first step entitles the movant to judgment as a matter of law. *See id.* at 323. In measuring the movant's arguments against that standard, the Court must view the evidence in the light most favorable to the non-moving party. *Saint Vil v. Blue Ash Healthcare, LLC*, No. 1:23-cv-85, 2024 WL 3373312, at *3 (S.D. Ohio July 9, 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). But if the movant carries its burden, then summary judgment is appropriate unless the nonmovant can "present some sufficient disagreement" through citations to facts in the record "that would warrant submitting the dispute to a jury." *Id.* (cleaned up).

How does that play out in the "peculiar posture" in which FOIA disputes come up for summary judgment? *See ACLU of Michigan v. FBI*, 734 F.3d 460, 465 (6th Cir. 2013) (citation omitted). To start, "the burden is on the agency to sustain its action." *Cincinnati Enquirer v. DOJ*, 45 F.4th 929, 932 (6th Cir. 2022) (quoting 5 U.S.C. § 522(a)(4)(B)); *see also Prof. Programs Grp. v. Dep't of Comm.*, 29 F.3d 1349, 1353–

54 (9th Cir. 1994). Further, as the Sixth Circuit has explained, FOIA plaintiffs are "handicapped" when agencies move for summary judgment because "only the agency truly knows the content of the withheld material," and consequently whether the withholding is justified by one of the enumerated exemptions. *Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994). That handicap is somewhat compounded in situations like this one, where the agency has gone beyond merely withholding records, and instead declined to confirm or deny whether responsive documents even exist—a tactic known as a "*Glomar* response" after an early case in which the Central Intelligence Agency famously adopted the maneuver. *See generally Phillippi*, 546 F.3d 1009.

To "level this unequal playing field," courts require agencies to submit affidavits describing why the withheld material falls within at least one FOIA exemption (or, if the agency recites a *Glomar* response, why confirming or denying the very fact of the records' existence would fall within an exemption). *Jones*, 41 F.3d at 242; *ACLU*, 734 F.3d at 464 n.2; *see also Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978). So the "primary question" in cases where the agency has asserted a *Glomar* response at summary judgment is a "legal one," *ACLU*, 734 F.3d at 465— namely whether the agency's affidavits show that the requested records' very existence "constitutes information itself protected by [a] FOIA [e]xemption." *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007); *see also Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012).

In sum, the Court's task is to determine whether the DOJ's affidavit, (Hale Decl., Doc. 19-4), "describe[s] the justification[] for nondisclosure with reasonably

specific detail." *Wolf*, 473 F.3d at 374 (cleaned up). If so, the Court must then determine whether the Enquirer has "controverted [the DOJ's affidavit] by either contrary evidence in the record [or] by evidence of agency bad faith." *Id.* (cleaned up). If the Enquirer does so, the agency's *Glomar* response is inappropriate, and the Court may order the DOJ to conclusively confirm or deny the records' existence, file an index of responsive records, and/or submit the records for in camera review, at which point the Court would make a merits determination as to whether those records (if they exist) fall within an exemption. *See* 5 U.S.C. § 552(a)(4)(B). But if the Enquirer fails in its efforts to challenge the *Glomar* response, the DOJ is entitled to summary judgment without revealing whether any responsive records even exist.

## LAW AND ANALYSIS

The FOIA embodies a simple philosophy—"a democracy cannot function unless the people are permitted to know *what their government is up to*." *DOJ v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 772–73 (1989) (quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J., dissenting) (emphasis added by quoting Court)). Importantly, though, that philosophy has limits: the government need not disclose information that is "exempted [from the FOIA] under clearly delineated statutory language." *Id.* (quoting *Dept. of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)). At the same time, "[o]nly if one of the enumerated FOIA exemptions applies may an agency withhold requested records, and even then, the exemptions are to be narrowly construed." *Rimmer*, 700 F.3d at 255 (citation omitted) (quoting *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)).

Two of those exemptions come into play here: Exemptions 6 and 7(C), which the DOJ invokes to shield its *Glomar* response with respect to the text messages the Enquirer requests. Those exemptions cover two different classes of records. Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). And Exemption 7(C) covers "records … compiled for law enforcement purposes, but only to the extent that production of such law enforcement records … could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).

To the extent the exemptions overlap (i.e., when the requested records fit into both the "personnel or medical files and similar files" and the "compiled for law enforcement purposes" categories), only the Exemption 7(C) analysis is necessary, because it "provides broader protection than Exemption 6 and thus establishes a lower bar for withholding material."[5] *CREW v. DOJ*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014) (internal quotation omitted); *see also Al-Dolemy v. FBI Detroit Field Off.*, No. 21-10809, 2022 WL 17408664, at *4 (E.D. Mich. Sept. 29 2022) ("Since Exemption 7(C) provides broader privacy protections than Exemption 6, the Sixth Circuit found it useful to analyze Exemption 6 under Exemption 7(C).").

---

[5] Exemption 6 protects records whose disclosure would "*clearly*" invade the subject's personal privacy, whereas Exemption 7(C) drops the heightened adjective. *Compare* 5 U.S.C. § 552(b)(6) with *id.* at (b)(7)(C); *see also National Archives and Records Admin. v. Favish*, 541 U.S. 157, 165–66 (2004).

Accordingly, because the Enquirer doesn't dispute that the DOJ's *Glomar* response *could* be analyzed under either exemption, and given that it appears the requested records (if any exist) would have been compiled for law-enforcement purposes, the Court will focus on Exemption 7(C). (*See* Doc. 22, #129–30 (recognizing, albeit impliedly, that the text messages requested by the Enquirer satisfy Exemption 7(C)'s threshold requirement that the records were compiled for law enforcement purposes)). That exemption, in turn, requires the Court to "balance the public interest in disclosure against the privacy interest Congress intended Exemption 7(C) to protect." *Cincinnati Enquirer*, 45 F.4th at 933 (quoting *Detroit Free Press, Inc. v. DOJ*, 829 F.3d 478, 481 (6th Cir. 2016)). To do so, the Court must first identify the competing interests at stake, and then determine their relative weights.

**A.    The Seven Named Individuals Have a Well-Recognized Privacy Interest in Whether They Are Implicated in a Law Enforcement Investigation.**

The DOJ argues that, in circumstances such as these, a *Glomar* response is justified because "[i]ndividuals have a substantial privacy interest in the fact of whether or not there exist law enforcement records … naming them, even if they are not the subject of investigation." (Doc. 19-4, #118). The caselaw bears that out. In *Reporters Committee*, the Supreme Court described Exemption 7(C) as reflecting privacy interests in "avoiding disclosure of personal matters." 489 U.S. at 762. And the Sixth Circuit further elaborated on that in *Cincinnati Enquirer*—a previous case involving these same parties. There, the Sixth Circuit explained that the exemption serves to protect "people who were investigated for suspected criminal activity or who

9

were otherwise mentioned therein." 45 F.4th at 933 (quoting *Rimmer*, 700 F.3d at 257); *see also Detroit Free Press*, 829 F.3d at 481 (explaining that "[e]mbarrassing and humiliating facts—particularly those connecting an individual to criminality—qualify" for protection under Exemption 7(C)). Applying those lessons here, it's easy to discern the contours of the seven named individuals' privacy interests: confirming "whether or not [an individual's] name appears within law enforcement files could … result in dire consequences, including harassment, intimidation, threats, damage to reputation, social exile, or even economic and physical harm." (Doc. 19-4, #118–19).

The Enquirer sees things differently. It argues broadly that the records it seeks are "public records" for which "there are no privacy interests." (Doc. 22, #126–29). More specifically, it contends that the text messages it requested are public records under Ohio state law, destroying any reasonable expectation of privacy in those records under the federal constitution (a proposition that the Court accepts only for the sake of argument). (*Id.*). That argument misses the mark for two reasons. First, privacy interests recognized under the FOIA—a federal statute—are neither circumscribed by state law nor limited to the federal Constitution's notions of privacy.[6] *Detroit Free Press*, 829 F.3d at 484 ("State policies do not determine

---

[6] Further confirming the point, Ohio's public records law is directed only at state and local agencies. *See* Ohio Rev. Code §§ 149.011(A), 149.43(A)(1) (defining "public records" as "records kept by any public office," and "public office" as "any state agency … or entity *established by the laws of this state*[.]" (emphasis added)). It is thus unsurprising that Ohio's public record laws do not inform the FOIA's reach. That said, to the extent that the Enquirer contends that the records it requests are subject to Ohio's public records laws, (*see* Doc. 22, #128 n.1), it may wish to seek the records directly from the involved state public office or state public officials. *See* Ohio Rev. Code § 149.43(B)(1) (allowing "any person" to request

10

Exemption 7(C)'s meaning." (cleaned up)); *Reps. Comm.*, 489 U.S. at 762 n.13 ("The question of the statutory meaning of privacy under the FOIA is, of course, not the same as … the question whether an individual's interest in privacy is protected by the Constitution."). Second, and more fundamentally, the Enquirer's argument is misdirected, since the privacy interest at issue on the face of the DOJ's *Glomar* response is not in the *content* of the purported text messages, but rather in the question of whether the DOJ's files contain any such records at all.

In short, the DOJ has identified a legitimate privacy interest on the part of the seven named individuals as to whether its files contain responsive documents, and the Enquirer has failed to show otherwise.

**B.     The FOIA Recognizes a Public Interest in Disclosing Information to the Extent It Sheds Light on the DOJ's Charging Decisions—But Not in Disclosing Information That Reveals Wrongdoing by Local Governments.**

The existence of a privacy interest, though, is only half the battle. The Court must now consider whether the public also has an interest in knowing whether the DOJ has records containing text messages between Dennard and the seven named individuals. If so, the Court must balance the two interests. As to the public's interest, the burden is on the Enquirer to show both a "significant" public interest and that

---

public records from any "public office or person responsible for public records"). Of course, the Court understands the Enquirer's plight, given its allegation that "the records are now in the federal government's possession[,] necess[itating] a FOIA (as opposed to Ohio public records law) request." (*Id.* at #131). But, while that may be so, the purported records' location does not change Ohio's statutory text. That text only applies to "entit[ies] established by the laws of [Ohio]." Ohio Rev. Code § 149.011(A). The DOJ is not such an entity. In other words, if Ohio's public records law is to help the Enquirer in its search for Councilwoman Dennard's text messages, the Enquirer will have to deploy that law against an entity to which it applies, not seek to indirectly engraft it onto the FOIA.

11

the information it seeks is "likely to advance that interest." *Rimmer*, 700 F.3d at 257–58 (citation omitted). On that front, the Court understands the Enquirer to be alleging two public interests supporting disclosure: (1) that the text messages will help the Enquirer "uncover[] the full extent of [the City Council's] corruption [and] whether such corruption still exists," and (2) that the text messages will help the Enquirer inform the public as to "whether the [federal] government diligently exercised its prosecutorial discretion" in deciding not to bring charges against the "other individuals" implicated by those messages. (Doc. 22, #132).

Those purported interests do little to advance the Enquirer's arguments here. To start, the Court observes that the Enquirer's public-interest arguments seem misdirected for largely the same reason as its privacy-interest arguments: the arguments are based on the supposed *content* of the alleged text conversations, not the very fact of their existence. The problem with such arguments is that the text conversations themselves are not before this Court. Indeed, the very design of the DOJ's *Glomar* response guarantees that neither the Court nor the requester knows whether the text conversations exist. So by arguing that "there is a strong public interest in disclosing *the records*," (*id.* at #132)—an argument that presupposes the records' existence—the Enquirer failed to address the only question properly before the Court at this point, which is whether there is a public interest in learning whether the records *exist* at all.

Even putting that aside, the Enquirer's first asserted public interest fails as a matter of law. Admittedly, "the core purpose of the FOIA," is to permit "public

12

understanding of the operations or activities of the government." *Detroit Free Press*, 829 F.3d at 485 (cleaned up). And at first blush, that sounds exactly like what the Enquirer seeks here: text messages that would expose to public scrutiny the inner workings of the Cincinnati City Council. But for FOIA purposes, the "government" means the *federal* government, not state (or, by extension, local) entities. *Rimmer*, 700 F.3d at 258 (citing *Landano v. DOJ*, 956 F.3d 422, 430 (3d Cir. 1992) ("[T]here is no FOIA-recognized public interest in discovering wrongdoing by a *state* agency." (emphasis in original))). So it doesn't matter, for FOIA purposes, that records evidencing a City Councilwoman's subterfuge would aid the public's scrutiny of local government. Unless the records shed light on a federal "agency's *own conduct*," *Reps. Comm.*, 489 U.S. at 773 (emphasis added), their disclosure does not serve the specific public interest that FOIA recognizes.

Perhaps recognizing this mismatch, the Enquirer separately argues, at least in passing, that "disclosure of the records would likely reveal much about the diligence of the Department of Justice's exercise of its prosecutorial discretion." (Doc. 22, #131 (cleaned up)). That's a more promising start. As noted, FOIA is designed to allow citizens to determine how the federal government—including the DOJ—is operating. But the argument again disregards the DOJ's *Glomar* response, in that the argument presupposes that the records exist. In other words, it is the *content* of the records that would allow the public to assess the DOJ's exercise of "its prosecutorial discretion." So that argument doesn't work on the facts here. Perhaps the Enquirer instead could have argued that forcing the DOJ to disclose whether the

13

records exist would inform the public about the DOJ's *thoroughness* in investigating allegations of corruption—another aspect of the agency's conduct. But the Enquirer hasn't raised that argument anywhere. And under the party-presentation principle, the Court cannot enter "the business of making arguments for parties." *Brashear v. Pacira Pharms., Inc.*, No. 1:21-cv-700, 2024 WL 3860465, at *4 n.5 (S.D. Ohio Aug. 19, 2024).

In sum, the Enquirer has not carried its burden to "show that the public interest sought to be advanced is a significant one ... [and that] the information is likely to advance that interest." *Rimmer*, 700 F.3d at 257–58 (citation omitted). That makes the final part of the Exemption 7(C) analysis—weighing the privacy interest against the public interest—straightforward: something weighs more than nothing, so the DOJ is entitled to summary judgment.

## CONCLUSION

Because the DOJ's affidavit adequately justifies its *Glomar* response and because the Enquirer has produced no evidence to the contrary, the Court **GRANTS** the DOJ's Motion for Summary Judgment (Doc. 19). The Court **DIRECTS** the Clerk to enter judgment and to **TERMINATE** this case on its docket.

**SO ORDERED.**

January 10, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**